Good morning, Your Honors, and may it please the Court, my name is Walter Woodruff, and I represent Gertrude Parker and Rodney Hesson and their appeal challenging their convictions for conspiracy to commit Medicare fraud in violation of 18 U.S.C. 1349, as well as a conviction for conspiracy to make false statements related to healthcare matters in violation of 18 U.S.C. section 371. Did you represent them at trial, both of them? I did not, Your Honor. Each was convicted of a single count of those violations, and I'd like to thank the Court for the opportunity. I'm grateful to be able to argue before you here today, and while my briefing submitted several issues, and I realize that my primary purpose here this morning is to answer your three issues that I believe are my strongest issues. The first issue that I'd like to discuss will be whether the district court acted in abuse of its discretion when it refused to allow defense counsel the opportunity to individually wadir seven potential jurors who had expressed prejudice, if you will, or expressed their concerns to receive the evidence fairly upon learning that Mr. Hesson had had a prior conviction in Mississippi State Court for Medicaid fraud. Why is that significant if none of those people served as jurors? Well, Your Honor, I think part of what attends the right to an impartial jury is wadir and the use of peremptory challenges. Peremptory challenges are the only basis we have, or wadir is the only basis we have to find out the information we as trial lawyers need to make intelligent and useful uses of our peremptory exceptions. It sort of takes things out of order, in my mind, to look at the jury and say, well, if they didn't serve, could there really be any violation of the wadir, and I think that there still can be. The fact that they didn't serve is not really where the error comes in. I think where the error comes in is whether my clients were deprived the right to further explore with these seven people whether their prejudices could be rehabilitated or whether they could put those prejudices aside. Roberts. You have a case, if a juror, prospective juror, is biased, and therefore cause should have been stricken for cause, but counsel is obliged to use a peremptory, do you have a case that says that even though they didn't sit as a biased juror, there still is reversible error because counsel was obliged to use a peremptory? No. In fact, there's a case, I think, to the contrary, Your Honor. I think the case of the United States v. Martinez-Salazar says otherwise. But in that case, they specifically, the issue before the court was whether the district court's refusal to strike a juror for cause, forcing the litigant to use a peremptory, was error, and the court said it was not. That's not our question. We don't have enough information here to know whether any of these seven were strikable for cause because we were not permitted to ask that follow-up question. Roberts. The way you framed the question, do you have — this seems to me just a question of who gets to control individualized voir dire, right? Because Judge Barbier did say, hey, does anybody still have any lingering concerns about the prior conviction, essentially, and three said yes, then he voir dired them, and as I understand it, they were all — he struck all of them. So — All three of those were, yes, sir, for cause. Okay. So he does the individualized voir dire. So is your position just that in Federal criminal cases, attorneys have to do the follow-up question? Well, I think Rule 24 says, Your Honor, that it gives the district court judge the preliminary authority to do that. But it also says that the judge shall allow follow-up questions if he deems those questions are proper. And here, Mr. Hessen, if you read the colloquy in the voir dire portion of the transcript, with all due respect to Judge Barbier, I don't think he was doing a good job of — he was all over the place with trying to get these people rehabilitated. And he kept asking the question, can you receive the evidence, can you listen to the evidence, can you listen to the evidence? And those three that were called up, two of them initially said, yes, I can listen to the evidence. I can listen to this evidence. But it's still in the back of my mind that he has this prior conviction. And I think not only would I hold that against him for purposes of thinking he was more likely culpable for this violation than he would otherwise be, I also have a hard time finding his testimony credible should he take the stand. So essentially what they were saying was, is they had a real problem giving these clients the benefit of their presumption of innocence. And when Mr. Fanning, who was defense counsel to Rodney Hessen, said, Judge, can I ask a question, he said, sure. His question very succinctly cut to the heart of the matter. And his question was simply, would you give my client the same benefit of the doubt as you would anyone else who did not have this conviction? And the answer was no. And all Mr. Fanning wanted to do was to ask that same formulated question to those other seven. And it was a succinct question, and it was a question that teased out the exact information that he needed as a trial counsel to know whether — But none of them had raised their hand after he clarified. Well, they weren't asked. They weren't asked, Your Honor. But he had twice. Yeah, I thought it happened twice. Well, the judge asked twice, but Mr. — this was at sidebar with Juror 36. The defense attorneys have to be able to pursue. A judge's pursuit isn't sufficient. Not always, Your Honor. I'm saying in this particular case, if you read the transcript, I mean, Judge Barbier kept refining his question to can you receive the evidence, can you receive the evidence. He really didn't go deeply into these clients or this client is cloaked with a presumption of innocence. But defense counsel's question at sidebar, which the other seven did not hear, and Juror 36, who was the third of those three stricken, basically vacillated a little bit. She — when the judge was asking her his formulated question, she was saying, yes, I think I can do it, I think I can do it. But when Mr. Fanning asked his question, that's when it teased out the precise answer, no, I can't. But what is your theory of harm exactly, that you basically wasted peremptory challenges that you wish you could have saved for later? Yes. I think we used all seven — I say we, but my clients were forced to use seven of those as to those seven prospective jurors because they — by not being allowed to ask that question, Your Honor, they could not make intelligent and useful use of those exceptions or those exceptions for cause had they been able to ask the question. My question, though, is, does the Constitution give you a right to peremptory challenges or simply a right to an impartial jury? That's kind of a — the cases seem to suggest there is no constitutional right, Your Honor, to — under the Sixth Amendment to peremptory challenges. But the Supreme Court has said that peremptory challenges are a part of the right guaranteed under the Sixth Amendment. But the right ultimately is to an impartial jury. The right is to an impartial jury. What is your evidence that your jury was not impartial? Absolutely no evidence, Your Honor. But that, again, works in the reverse. And in thinking about that question and anticipating that question, one wonders if all that matters — if all that matters are that the ends justify the means, then what is the purpose of a peremptory exception? Because exceptions for cause would get prejudicial people off the jury. Exceptions for cause in and of themselves would guarantee a criminal defendant a right to a fair and impartial jury. So the fact that we have peremptory exceptions, I believe Justice Ginsburg has referred to them as auxiliary rights, not necessarily a right recognized under the Sixth Amendment, but auxiliary rights. And in the case of United States v. Martinez-Salazar, that was a case where they found that the defendant's use of a single peremptory exception — because the district court would not kick the prospective juror for cause — the use of that single peremptory exception was not a violation of the Sixth Amendment. This case is different because we're not — we don't know whether any of these seven would have been put off for cause. What I do feel fairly confident about is had they answered Mr. Fanning's question the way Juror 36 did, they would have been put off because Judge Barbier had no problem. As soon as that Juror 36 answered Mr. Fanning's question, he had no problem putting that juror off for cause. So this is more substantial because my clients were forced to use seven peremptory exceptions to get these seven people off, all because they weren't allowed to ask a follow-up question. The fear about bias relates to the prior conviction, right? Yes, yes, sir. And that blurs into your larger contention that there was error throughout trial because of improper 404B? Well, there was questions about that, and that also dovetails into the severance because the whole basis of the severance for Mr. Hessen's mother — My question then is, did Judge Barbier at any point in this trial misinstruct under 404B? In other words, assume the prior conviction isn't intrinsic, it is extrinsic. Is it fair to say he throughout told the jury how to assess that evidence? Well, let me make sure I understand. Are you asking whether he told that during voir dire or when he instructed the jury or throughout — once the jury was impaled? I guess I'm thinking all stages. It was reading the record myself. It looked like he did carefully caution that the charge defense was not the prior conviction that Hessen had. They shouldn't — He did, Your Honor. But I don't think he came close enough to explaining the presumption of innocence which — with which my client was cloaked. And again, when he kept following up, when these 10 people indicated a problem upon learning of this prior conviction, he kept going back to, can you hear the evidence? Can you listen to the evidence? And again — I guess I'm saying we've heard the argument on voir dire, at least. You're well — it's fine to stay with it. You have six and a half minutes left. But you also had an argument to the introduction even if the voir dire is clean. Even if the voir dire is clean, there are — there's an issue about whether the evidence is sufficient to sustain the conviction as to Gertrude Parker. And I'd like to talk about that a little bit if I could, Your Honor. After the filing of my original brief, but prior to the filing of my supplemental or my reply brief, this Court handed down its decision in United States v. Ganji. That was a health care fraud case in which defendant Elaine Davis, who owned the clinic, was indicted along with a couple of the doctors from that clinic. And she appealed her conviction. And the Court found that the evidence was insufficient to sustain Ms. Davis's conviction. Essentially, the evidence in that case amounted to nothing more than her being in proximity to the activities of other co-conspirators. And this Court, speaking through its chief judge, says that's not enough. Mere proximity, mere relationship to other co-conspirators, knowing that something criminal is afoot, none of those things is sufficient to establish that this person knowingly and voluntarily entered into an agreement that had an unlawful purpose. And I think in this case, the parallels are uncanny. You know, Ms. Davis was not a physician. She was an accountant. And the government in that case tried to say, well, look, she really had a lot of ministerial things. She wrote checks. She hired people. She was involved in the day-to-day operations. She said two flips that testified for the government? It did. And then the co-defendant testified and was cross-examined. Were those factors in Ganji also? They were not in Ganji, Your Honor. So the jury had a little bit more to come to its conclusions about deliberate ignorance. And I don't know that they had more to come to as far as Parker's concern. What about the special agent did say, hey, I've read the records, and these are impossible hours. And then what's Stubblefield? Stubblefield. Stubblefield, Beverly. Describes conversations with Ms. Parker about, hey, if we build the way we're actually, right, you remember that quote? I do remember that quote. Incendiary. Right. So at that point, doesn't the jury have sufficient room to say, well, we infer fraud here? It's not just her position. Well, it's not just her position, but Beverly Stubblefield does, I think, more than Teal. I don't know that Teal, to be colloquial, lays a glove on Ms. Parker. Stubblefield comes closer, and she does say some things that are potentially incriminating. But when I read the government's brief, I mean, the government still is talking about her subjective knowledge. The government's talking about her position. The government focuses on the position that she knew or should have known. And Ganji very clearly says that is what's not allowed. When you run out of time, would you address the issue with the expert testimony that you're complaining about? Yes, Your Honor. Dr. Daniel Marsan was called to testify, and his testimony was subject to a motion And in response to some of the concerns that were raised in the enlemne, the government made a representation to the district court that this is a fraud case in which defendants are charged with conspiracy to commit health care fraud. None of Dr. Marsan's opinions or conclusions will touch upon the ultimate issues for the jury to decide. That is, whether defendants committed fraud by submitting false and fraudulent claims to Medicare, or whether they made false statements. None of Dr. Marsan's opinions touch upon defendants' intent or mental state as an element of the offense. Rather, his opinions will only assist the jury in understanding the evidence. And, Your Honor, I think a fair reading of Dr. Marsan's testimony establishes that he impermissibly opined on the defendants' requisite intent to defraud Medicare by essentially stating that they acted with the requisite intent to defraud of the government for the purposes of their own profit. In my briefing, I set forth several quotes that I think are either at or over the line of what he was the government said he was going to testify to. Also, I think it's over the line of 704B, or 704, because he testifies to their mental state. And, again, I would like to remind the Court that these are — he's interpreting emails of which he is not a participant. He's reading these as a detached third party trying to infer what the mindset and the state of minds were of these interlocutors. In reviewing one email, I think this is very revealing about the sort of goals and focus of nursing home psychological services. This is an email that is focused on maintaining company profits without any concern for patient care. So that speaks to the profit aspect of it, Your Honor. Another one. I see this email as their effort to make this ethically highly compromised activity more accessible and more justifiable to their psychologists, even though it should not be. I think it's egregious, completely egregious, and unethical and wrong. But these emails taken together represent the ultimate goal of nursing home psychological services, which was to generate profit in assessing nursing home residents, many of them unresponsive. But I think perhaps the worst case came when Dr. Marsan was asked if he could summarize or distill his overall opinion, and he said, this is the most egregious case of inappropriate psychological care and billing of older adults that I've ever seen. Again, I think many of these comments are at or over the line of 704B. I think they're all over the line of what the government said he would be called the best case is about the line between scienter and horrible practices, fraudulent practices, but not exactly saying defendant's state of mind. It's right. We've wrestled with that. Yeah, that's a hard line of demarcation, Your Honor. What's your closest case? Probably in the briefs, right? Well, I mean, like I said, it is probably in the brief, but I think these taken individual, some of these individually are grade worse than others, but when taken collectively, again, I do think he's testifying that they're acting with deceit to gain a profit, which is the definition of fraud. Thank you. I'm out of time. Thank you, Your Honors. Good morning, and may it please the Court. Jenny Ellickson for the United States. The jury voir dire was sufficient, but the Court need not reach that issue because the defendants challenged only the voir dire of prospective jurors who did not end up on the jury. The questioning during voir dire helped the defendants to determine whether or not they should use their peremptory challenges on these jurors. The defendants had heard enough based on that response to the first question. They made a choice to cure any potential prejudice from the lack of individual voir dire for those jurors by taking those jurors off the jury. For the record, it was actually six peremptory challenges they used rather than seven because one of the seven jurors had already been struck for cause based on the scheduling issue. But the use of the peremptory challenges, therefore, guaranteed the defendants all that the Sixth Amendment requires, which is a trial by a fair and impartial jury. So you briefed both. One's a legal answer conclusive across all cases. Another one's factually that Judge Barbier here sufficiently inquired. Yes. The government's position is that we should reach that Sixth Amendment comprehensive legal answer? I think the Court can certainly affirm based on the sufficiency of the voir dire. I think the record speaks for itself here that the judge was very careful in making sure that he sussed out any potential issues with these jurors. Why would we want to reach the constitutional question first? Or is it just that it's been decided conclusively? And if that's the position, what's your best circuit authority for that, circuit authority? I think it's certainly been conclusively determined by the Supreme Court. I know. I'm asking you what circuit has applied that to say that even if there were error in voir dire, it's never harmful if they use peremptories. What's your best circuit case stating that blunt proposition? This Court, I'm not sure. I think this Court generally does evaluate the sufficiency of the voir dire, and then often says in the alternative, even if there were error. This Court's decision in Pratt, for example, is one of the more recent cases where this ---- Do you know any circuit that has pretermitted and decided there couldn't be error because it's harmless? Do you know any Court that's done that? I'm not aware, Your Honor. There may well be, but I'm not prepared to answer one way or another. But certainly the voir dire was sufficient here because the district court gave defense counsel the opportunity to conduct collective voir dire, and that collective voir dire is what elicited the information that the defendants are now concerned about. And following the ten jurors' initial answer to that question about the conviction being something that would be inclined to make them potentially disfavor at least Mr. Hessen, the district court was careful to instruct the jury about the fact that that conviction was not a basis on which to find him guilty, that he remained innocent as he sat in the courtroom, and that the judge would be giving them very careful instructions about the limited uses to which they could put the conviction. He then asked the jury whether any of them would have trouble following those instructions. Three of the jurors raised their hands. I think you can tell from that context that all of the jurors would have felt comfortable answering truthfully if they did have concerns because three of the ten did. The other ten did not raise their hands, expressed no concerns. The district court appropriately conducted additional voir dire of those three jurors and decided to strike them based on their answers. But there's no indication on this record that the seven jurors who said that they would be able to follow the court's instructions would not, in fact, have been able to follow those instructions. So certainly on the merits of the sufficiency of the voir dire, the court can affirm on that basis without reaching the prejudice question or the Sixth Amendment question. With respect to the sufficiency of the evidence as to Parker, the evidence definitely showed that she was a knowing and intentional participant in the conspiracy. This was not a situation of she perhaps should have known or maybe she didn't know. The evidence was clear that she knew. She was not aware of that other than the two co-defendants testifying. And what — The specific evidence establishes that other than the testimony of the co-defendants? The testimony of the co-defendants was certainly important, but it was corroborated by testimony from other witnesses who worked in the company as well as documentary evidence. So, for example, the evidence that it was Parker who was promulgating the fraudulent policies at PCS, we know from one of the cooperators, Stubblefield, she said that Parker was the one developing the policies and procedures. That testimony is at ROA-2744. But it's also confirmed by the orientation agenda for a June 2012 orientation that the company held at the very beginning of PCS, which you can find that agenda at ROA-7152. That agenda says that the person who was doing a presentation on policies and procedures for the company was Parker. Then an hour — Right. Did the government elicit, when it had an opportunity to cross-examine the son, did it elicit anything that directly implicated Parker, the mother, in the overbilling, in cross-examination? Your Honor, I don't recall any testimony. And what about any testimony of the flips? Did they ever say she was in cahoots, anything like that? Yes. What's the best quote? I think the best — the best quote is one of the quotes that came up during the previous argument, which is Stubblefield's testimony, that she and Parker discussed the fact that PCS would make less money, quote, if psychologists charged what they actually did. Oh, that's the best, yeah. Yes. And that was at ROA-2714. Was that a stressed and closing argument? Pardon? Was that quote stressed and closing argument? I assume it was. I think — I think — I'm sure it was. I can't — I can't remember, you know, right off the top of my head. But that was — that was certainly evidence. But it wasn't only that evidence. There was also evidence from lower-level PCS employees who were not cooperators per se about how Parker was monitoring billing and Parker was paying attention to how much the psychologists were billing, that she expected all of the psychologists to bill 4 to 5 hours per evaluation, and that she would come after them if they didn't, that she would — Was it testimony she knew they were only doing 30 minutes? Well, we know from other evidence that she knew that — she knew that they were doing far more evaluations a day than 4 to 5 hours would allow. So for example, we have this — this email early on that she received during her first six weeks involved in the company where one of the psychologists emailed her, you know, with questions about compensation, saying, I need to be paid for all of these evaluations I've done. And she's reported how many evaluations she had done on different days. On one day, she said she had done seven evaluations. You can find that email at ROA-7246. That shows that from the very beginning, Parker knew that people were doing seven or more evaluations, and yet she was expecting them to bill 4 to 5 hours per evaluation. We also know that PCS developed a goal of 10 to 12 evaluations per psychologist. We know that Parker was the one developing the — pardon? Or is it? Well, it was — yes, I think that was — yeah, it was 10 to 12 evaluations a day. And we also know from Teresa Ridgeway, who is one of the lower-level employees of the company, that Parker kind of fussed at her — that's a quote — when she didn't procure at least 10 referrals for a nursing home visit. The way these visits worked is that a psychologist and an assistant went to the nursing home together, and they would sort of tag-team their way through these evaluations. And so Parker expected all of the assistants to make sure that when they went to a nursing home, they had 10 referrals. She wanted to make sure she was getting an efficient use, what she viewed as an efficient use of her psychologist's time. You can find that testimony from Teresa Ridgeway at ROA 1769 to 70. You haven't had a chance to distinguish the Ganji opinion. Do you have a quick thought on it? Yes. I would like to distinguish the Ganji opinion. The issue the Court found in Ganji was that in the Court's view, there was no — there was no evidence that Elaine Davis, the owner of the company, had actually agreed with anyone to commit health care fraud. In fact, the Court found that the record supported her innocent explanations of her actions, and that at most, her leadership position suggested that she should have known about the fraud, not that she actually did know. And in fact, her unrefuted testimony at that trial was that she had little involvement in the company's administrative matters and no involvement in medical matters. Our situation is very different. We have direct testimony from, among other people, the clinical director of the company, Beverly Stubblefield, that she discussed the overbilling with Parker. We also know that Parker was actually overseeing what the doctors were doing. She — when Stubblefield complained about a new company policy, for example, that required the psychologists to write notes in their patient evaluations thanking the physician who had referred the patient to the company, when Stubblefield complained about that to Parker, Parker overruled her and said, I think those notes are important. She also required the clinical education coordinator, Teal, who's the other cooperator, to run anything by her first before he sent anything out to the psychologists in the company. And we know from the e-mails that he was the person who was promulgating new policies. We can — the jury can infer from that testimony that he was running those by Parker first. You can find that testimony from Stubblefield and from Teal at ROA-2213 and ROA — I know that the jury didn't convict her in part because here sort of radioactively there was a prior Medicare fraud conviction in the case. The conviction was intrinsic evidence that was actually very important to explaining how Parker ended up in this company. So it was appropriate for the district court to admit it. But the instructions certainly ensured that the jury didn't give it improper weight. Prior convictions, I mean, the rules of evidence deal with them very carefully. And it has been your position throughout that this is intrinsic. Yes. But in the alternative, if the Court disagrees with that, it was also extrinsic evidence. Did Judge Barbier, although he used the word intrinsic at the very outset, it looked to me thereafter he always said this is a different crime, you can't use this to convict. His instructions were — he gave instructions that were consistent with Rule 404b. I don't think that suggests that he had reconsidered his earlier ruling that it was intrinsic evidence. I think perhaps he was just being very careful, understanding how potentially dangerous it is to — But if it is intrinsic, then you don't need to adhere to any of 404b's restrictions. The government then, in closing, could have said you heard that Hessen was convicted before. That means he's guilty now. It's all part of the same offense. You didn't argue that, did you? No. It was intrinsic in a slightly different way. It explained more the transition to the — But as I read the rule, if it was intrinsic in terms of it showed opportunity and preparation, that still means it's extrinsic. It's another act subject to 404b's limitations. Looks to me that's how Barbier restricted it. That's how I would think it would have to come in, right? This crime didn't even overlap. It was a year before the charged offense. Fair, right? Yes. What case says that a fraud offense that occurs and is over with a year before another charged offense is somehow still intrinsic to it in that you don't even need a 404b limiting instruction? Do you know of any case that says that? I think the statements that this Court made in the Ceballos case suggest that for a conspiracy, in the context of a conspiracy, this Court said, evidence is intrinsic to the underlying offense if it is relevant to establish how the conspiracy came about, how it was structured, and how the defendant became a member. Is that a prior conviction? I think that was an uncharged act. I'm just asking you if you know of any case where the government gets to introduce a prior conviction and say this is part of the conspiracy even though it's over a year before the conspiracy starts. Do you know any case that says that? I don't. Off the top of my head, I don't, Your Honor. But I think if this Court concludes that it is not intrinsic evidence, it still satisfies the requirements of extrinsic evidence that was admissible under Rule 404b. Can you use it as 609 evidence to cross Hessen? I don't recall. It would have been appropriate for that, right? Yes. It certainly would have been. And I think the district court also instructed the jury, I think, that they could consider it in evaluating his credibility. And that it — Is the prior conviction part of the explanation for why the mother took over? Yes. The prior conviction explained why NHPS became PCS. It explained why Hessen sold the company to Parker and why he handed his leadership role in the company over to Parker. He remained a conciliary to her, in effect, and was still advising her on the scheme, but she was the one who became the figurehead. And so it was appropriate, even as extrinsic evidence, because it explained their knowledge, their intent, their motivations. It was important context. And it wasn't evidence that the government was attempting to use to say, Hessen is the type of person who commits Medicare fraud because he committed Medicaid fraud in the past. It instead explained why all of these co-conspirators got together and why they were doing PCS. And, in fact, it was — it was important for the jury to know that that prior conviction was a piece of that story because otherwise they might have not have really accepted all of the evidence that PCS was just a continuation of NHPS's policies in every respect. They might have thought, well, this is a clean slate. Hessen was no longer in the company. It was now someone else running it. But when you have all of the evidence showing how — what Parker really envisioned PCS as being was a continuation of Hessen's work. And she said that repeatedly. Multiple witnesses testified to that, that she thought the company was too worthwhile to let go, that she wanted this to — you know, to keep doing the good work of the company. And so the prior conviction explains why it was necessary to change the name of the management of the company. So I'd like to turn now to the expert issue. Dr. Marson's testimony was not a clear, obvious violation of Rule 704B. And in any event, the defendants have not shown that the jury probably would have acquitted them but for the challenged testimony. So to begin with, this Court has been — construes Rule 704B narrowly, holding that it prohibits only a direct statement of intent or the functional equivalent of such a statement. Dr. Marson did not make a clear, obvious statement of the defendant's intent. Although he criticized the company's practices, he did not say that the defendants or others at the company engaged in those practices with an intent to defraud. But even if he had made such a statement, the jury would have convicted the defendants anyway because the other evidence in the case was so substantial. The testimony that the defendants have now challenged was a small sliver of the overall evidence against the defendants. It occupied only half an hour of testimony during a six-day trial. And the other evidence established that the defendants were developing and promulgating fraudulent policies at the company and that they were directing the psychologists to overbill. There is substantial evidence of that, which I think the Court understands. I'm happy to go through it if the Court is interested. But even if — even putting that aside, the expert testimony that the defendants now challenge was also cumulative of other evidence. It was directly cumulative of the e-mails themselves understood in the context of Dr. Marsden's earlier testimony, which the defendants have not challenged. Dr. Marsden's earlier testimony was about the general appropriateness of different psychological care procedures and billing practices and recordkeeping. He explained in the abstract what was appropriate and what was not. And then towards the end of his testimony, the government showed these e-mails to him, and he then, using the e-mails as kind of a representation of the policies of the company, he applied his earlier general statements to those policies, explaining his views about how the policies of the company were inappropriate and were not satisfying ordinary standards of psychological care. So the jury — you know, his final testimony certainly connected the dots for the jury a little bit, but the jury would have drawn the same inferences based on the e-mails themselves and Dr. Marsden's earlier testimony. And in any event, even if he hadn't testified at all, the other evidence in the trial made it very clear that the concern at NHPS and PCS was not with patient care. It was not with giving appropriate treatment. The concern was making money. The concern was getting as much money out of Medicare as possible. We know that Hessen was, you know, sometimes billing 20 or more evaluations a day, and he was billing five or more hours for each of those evaluations. One year, he billed 9,000 hours to a single psychological testing code for Medicare. Those policies and practices continued under Parker. Parker personally trained the people in the company on the policies and procedures, including, among other things, telling them when to bill, when and how to bill. And based on all of that evidence, even if Dr. Marsden had never taken the stand, the jury still would have convicted. If the Court has other questions about that issue or anything else raised in the brief, I'm happy to answer any other questions the Court may have. On the final issue, it didn't look like in your brief you were saying the joint and several liability is correct legally in light of Honeycutt and Sanjar, but your position is simply that they waived the issue? Or do you have a merits answer to it? I think that they certainly waived the issue. The only issue that they raised in their brief related to the amended judgment. They've never — Parker has never — Let's say they had properly objected to imposition of joint and several. What would you concede that it would be improper in light of current law? Well, they didn't object. So — If they had objected, what law do you say that a judge can still impose joint and several liability? Honeycutt says that you can't require a defendant to forfeit proceeds that that defendant didn't obtain, but the problem for Parker is that she has not alleged that the forfeiture order here required her to forfeit profits that — proceeds that she didn't obtain. She hasn't even addressed the terms of the forfeiture order at all. It's an issue that she hasn't developed, but the forfeiture order, even if the Court wanted to, you know, delve into that issue despite the fact that she hasn't briefed it, it's neither clear nor obvious that the forfeiture order does require her to forfeit improper proceeds. She was running this company when it was PCS. PCS obtained $7.3 million from Medicare under her watch. I think as the owner of the company, you can say all of that was proceeds that she — that she received. The forfeiture order was a bit higher than that, but not — it was — I think it was a little bit more than a million dollars more than that. But she also acquired NHPS while it was still operating as NHPS. There was — there was this transition period. So there would have been additional proceeds that she presumably would have obtained during that transition period. And again, you know, it's not clear on this record exactly what the — all of that adds up to necessarily. But the reason that the record isn't clear is because the defendants didn't raise a Honeycutt objection below. And Honeycutt had already been decided at the time of sentencing. If the defendants were concerned that this forfeiture order required Parker to forfeit to it then, they haven't done it now. Unless the Court has further questions, I will submit on the briefs. Thank you. Speaking to the 404B information, Your Honor, I think it's clear that this really was extrinsic. When Parker was in Mississippi, he was operating as a psychologist. Here he was operating as a consultant. I don't necessarily appreciate the reference of him being a conciliary or all the connotations that come with that term. But he was in — he was the director of marketing when — under the second company, PCS. The law of this circuit is clear. Matters involving a conspiracy, as far as an action taken in furtherance of the such an action may be introduced as extrinsic evidence. However, when the other act is a distinct, indistinguishable event or an act that is not necessarily a preliminary step towards the charged conspiracy, it is not considered intrinsic. Again, this conviction in Mississippi was over a year before this. I hardly think it can be deemed to be a step in furtherance of the conspiracy charged at PCS. As far as Dr. Marsan and whether the jury would have reached or drawn the same inferences based just on the e-mails, I highly doubt that, Your Honors. I mean, Dr. Marsan was crawling into the mind of these people who had written the e-mails saying what their mental states were, what they were trying to do, what they were trying to communicate. Finally, I just want to touch back upon Rule 24, which does give the court the authority to examine the jurors or permit the attorneys to do so. So the court can do that. But subpart 2 does say if the court examines the jurors, it must permit the attorneys for the parties to ask further questions that the court considers proper. And I would just my review in summation is no substitute for this Court reading, I think, the voir dire, the portion of the transcript covering the voir dire. And that is found at record on appeal pages 1328 to 1353. And I think there's little doubt that further questioning would have been proper in light of where this was, where it went, and where it needed to go. Do you concede the government's final point that you didn't reappeal the amended judgment? I do concede that point. And, in fact, you had indicated to the district court you didn't oppose the government's motion? I did not oppose it. They did, right. And I think— You probably can't reach that. Probably can't reach it. But on the second part, on the deeper thought, Your Honor, I'm not necessarily sure that Ms. Parker's aggrieved by that judgment. Thank you. Thank you. Okay. We will hear the second part.